We'll now hear argument in Benyamin v. Mukasey. Good morning, Your Honors, and may it please the Court. I'm Robert G. Ryan for Petitioners Bob Benyamin and his wife and their three minor children. I'd like to reserve two minutes for rebuttal, and we note that there is no credibility issue in this case. Mr. Benyamin is a 46-year-old native and citizen of Indonesia. He is an indigenous Indonesian and a Muslim. His wife, Annabella Rodriguez, is a 49-year-old native and citizen of Venezuela and a Catholic. And as I just noted, they have three minor children, including two daughters and one son. Mr. Benyamin states two grounds for asylum. First, he claims membership in a particular social group, that is, Muslims married to Roman Catholics in Indonesia. And second, he claims a humanitarian exception based on the unfair treatment of his Venezuelan Catholic wife by his stepmother and other in-laws because of her religion and the unconsented-to circumcision of their then-infant eldest daughter in Indonesia at the behest of Mr. Benyamin's stepmother. Further, Mr. Benyamin argues that he has no assurance of a safe haven in the third country of Venezuela should the family be removed. In fact, in the immigration judge's removal orders, Mr. Benyamin is ordered removed to Indonesia and only Indonesia. That's at page 36 of the record. And his spouse is ordered removed to Venezuela and only to Venezuela, and that's at page 37 of the record. The three minor children have removal orders to Indonesia with alternative orders of removal to Venezuela. Mr. Benyamin submits that it is, quote, in the public interest for him to receive asylum in the United States, end quote. That's INA section 208A2, capital A, because a family separation may occur. And, of course, it would not be in the public interest to create the possibility of causing this family separation. It is true, isn't it, counsel, that this is only his application and others are derivative of it? That's correct, Judge Smith. So, therefore, whether the families are at the right safe haven or not is really an ancillary question. If he isn't entitled to asylum in the first place, then we wouldn't even need to get there, correct? Well, we believe that asylum is fruit in this case. I appreciate that, that you're also arguing that he is. But, in fact, we're really at the asylum. We could always remand for safe haven if we wanted to. We don't even have to get to that question if we really look at asylum. Well, we'd also use it, Your Honor, as a discretionary factor in favor of asylum as a mitigating or humanitarian factor to offset the adverse factor of the trips back and forth to Indonesia. How does that work legally? In other words, what's your legal construct for this discretionary asylum factor now that you're here on appeal? Well, Judge McKeown, of course, that's taken into account when the judge makes the assessment on asylum. That is discretionary factors, the adverse factors, and mitigating or favorable factors. So I wanted to bring this point in because it is something that has utility in more than one context, both safe haven and in the discretionary context. Could I just explain? You know, I find this to be a sad and a troubling case. But I am having some trouble fitting it into the statutory construct that we're faced with. So maybe you can help me out a little on that. So we have the father, and he's basically saying, I am persecuted in Indonesia because of my wife's Catholic religion. Is that a fair? That's correct, Your Honor. That's the first claim, membership in a particular social group. It also spills over to a humanitarian exception. And what is the evidence that would, in effect, tip over the finding of the immigration judge on that point? Well, for one thing, there is the Indonesian family card that's in the record. It doesn't even mention Ms. Rodriguez as Mr. Benjamin's spouse. That's at record pages 140 through 143. Does that rise to the level of persecution? Not by itself, Your Honor. I think along with the other evidence it would. But it's important to note that Mr. Benjamin said that she wasn't included in the card because, quote, she is not a Muslim and she is not Indonesian. At a minimum, we believe that she's not in the card because of her religion. Nationality may also play a part. But we would cite the 2002 and do rely on the 2002 International Religious Freedom Report. If I may just quote it briefly. It's at page 168 of the record. Men and women of different religions also had trouble marrying and officially registering their marriages. Independent observers note it has become increasingly difficult to obtain official recognition for interfaith marriages between Muslims and non-Muslims, end of quote. He also had to incur the shunning by his friends because of his wife's religion. Here's another question. I'm going to ask the government the same thing. A lot of what I find in here doesn't really relate to government conduct, but it relates to like the grandma and friends and family. How does that conduct get translated into official either religious discrimination or social group discrimination? I touched on that briefly just a moment ago, which is that the government is the one that's causing the problems. The government creates the atmosphere, if you will, for the discrimination, for the prejudice that may have occurred. Let me ask you to turn to the matter of the genital mutilation of the child. Can the father claim asylum based on this item as being persecution? Well, Judge Fletcher, we have, of course, attempted to make that argument. We did cite a matter of CYZ that was recently overturned by the attorney general. However, our case is also based on the humanitarian exception, a matter of Chen, and in this court, the Liao case. So we argue that he shouldn't have to return to a country that would allow for the unconsented to circumcision of his daughter, in addition to the fact that his wife had to suffer repeated indignities in that country. But again, the atmosphere is created by the government. Usually there's an atmosphere that's created by the government in which then the people who are acting are in some kind of close concert with the government. And here you have the grandmother, the mother of, undertaking the actions. And I'm having some trouble getting her an official link, other than that she lives in Indonesia. Well, maybe I could approach it this way. Mr. Benjamin didn't even consider taking any action with the authorities, and that probably speaks volumes to the fact that the authorities probably wouldn't do anything. This seems to be an accepted practice. Doesn't that lay on its head our precedent, which suggests that if, in fact, he doesn't take any action with the authorities, there's no way to bind the authorities to what happened? Isn't that our precedent? Well, answer that for us first. I'm not sure I actually follow the question with all due respect, Judge Smith. Well, as I read our precedent, when one wants to suggest that the government is either sponsoring or is turning their head to this action, which is what we've got to suggest, it seems that one has to have some evidence the government knows about it, or that the government was there doing it. And in this particular situation, I don't have that. There was at least acquiescence. Counselor, I want to ask you a question. This circumcision was performed at the hospital by a doctor or a nurse? Apparently, certainly at the hospital, no doubt about it. On the fifth day, Ms. Rodriguez was recovering from a C-section. I don't remember, Your Honor, to be candid with you whether it was a doctor or a nurse. I believe there is something in the record on that, but I can't recall it at this moment. Now, at that time, the government didn't forbid this procedure, is that correct? That is correct, Your Honor, from what we can derive from the record. In fact, the country report does talk about, the 2002 country report talks about FGM in Indonesia, that it does occur. It does occur in West Java. Jakarta, of course, is located in West Java. This is something that happens throughout the country. It's a very heavily Muslim country. Do you know what the 2007 country report shows? Your Honor, I don't. Okay. Although I think I did, I looked at the report briefly, but I don't recall what it said about that. You're beyond time. I think I am. I'll give you a minute for a follow-up. Thank you, Your Honors. May it please the Court. I'm John Arbab for the Attorney General. Your Honors, this is a substantial evidence case. Mr. Binyamin clearly did not establish his claim for asylum, and he has not shown that the evidence he presented was so compelling that no reasonable fact finder could fail to have found in his favor. Mr. Binyamin specifically did not prove, carry his burden of proving that he suffered persecution in Indonesia on account of his being married to a Catholic spouse. To quote from the immigration judge who's finding the board upheld, the record simply shows that as Mr. Binyamin himself acknowledged, quote, other than having his feelings hurt by having his friend shun him and having difficulty with his family, he has suffered no specific harm in Indonesia due to his marriage to a Catholic, close quote. Counsel, I'd like you to turn to this mutilation issue. What does the record show as to who performed it? Your Honor, the record indicates that the procedure, which is simply noted to be circumcision, was performed in the hospital. I think Mr. Ryan is correct that the record is not completely clear. I thought it was by a doctor. It was certainly by medical personnel. It may have been by a doctor or it could have been by a doctor. It was someone authorized within the hospital that did it. Yes, Your Honor. So far as the record shows, it's certainly not anything like the sort of outrageous or extreme forms of this procedure that the case has discussed. In this case, our Mohammed case says it doesn't matter what the form of the mutilation is, that any mutilation is persecution. Your Honor, I think that the Mohammed case could be read that way. Well, it says it right out. It's still, though, taking the case for what it says, it still does not support the claim here, because the court really needs to keep in mind that the daughter, Anissa, is not seeking asylum. The claims are completely derivative. The family member's claims are completely derivative. I asked counsel the question and I ask it to you. Is there support for the proposition that the parent of a child who has been mutilated against the consent of the parent has suffered persecution? I don't think there's any such per se rule, Your Honor. I think the key inquiry here would have to be whether Mr. Benyamin himself came forward with evidence that he was persecuted in Indonesia on account of Anissa's having been circumcised or for opposing her circumcision after the fact. And there was absolutely no evidence to support that kind of a claim of persecution. Well, I guess it really goes to a procedural question. Could the daughter now move for asylum, petition for asylum on her own behalf as a result of this? Yes, Your Honor. The children are able to file their own applications for asylum should they choose to do so. But here, of course, a decision was made with counsel that the family should proceed on a derivative basis and that Mr. Benyamin himself should be the only person formally seeking asylum. I guess I find this troubling in the sense of there's kind of two aspects to it. Is there any government involvement or is just the mere fact of it enough? That's my one question. And then the second is in the briefing trying to distinguish between this and certain tribal FGM, I found that to be kind of a rat hole that didn't make a lot of sense. And there seems to be a lot of hand-wringing over, well, it was this kind of cut and that, and it really wasn't as bad as this so it was really not too bad. Could you respond to those two issues? Because that's the way this was briefed. Certainly, Your Honor. First of all, I think it's important to keep in mind that Mr. Benyamin is the applicant and he is seeking asylum based on a claim of persecution on account of his membership in a particular social group. But the circumcision in this case that was performed in the hospital on Anissa has no nexus to the statutory basis on which Mr. Benyamin is seeking asylum. The fact that she was circumcised has nothing to do with the fact that Mr. Benyamin happened to be married to a Catholic. His stepmother wanted that procedure to be done based on her Muslim belief and Muslim practice. Counsel, we have the case where the people from Somalia were able to claim asylum based on the fear that their 9-year-old daughter might be circumcised if they were sent back to Somalia. Now, here we have the first child has had that treatment. They have a 5-year-old daughter, and there's a claim that this is a fear that it might occur to her. Now, how do you respond to that? Your Honor, I would make two points about that. You're referring to the older daughter. Pardon? You're referring to the older daughter, Anna Karina, who has not been circumcised. I think that there would not be a basis for a claim of well-founded fear for future persecution, namely fear that she might undergo the procedure where this family is sent back to Indonesia, and there are two important facts, I think, to bear on that. First of all, her mother, Ms. Rodriguez, herself testified that as practiced in Indonesia, quote, a woman has to be circumcised just after she's born and not afterwards, unquote. That's at page 96 of the administrative record. In other words, Anissa is too old to be circumcised now if the family went back to Indonesia. Secondly, I think there's another important point, and that's Mr. Benyamin's own testimony, that although his mother and stepmother would pressure him to have Anna Karina circumcised if they returned to Indonesia, he could prevent that from happening by withholding his consent. So I think in regard to the second daughter, Anna Karina, there is, on this record, no well-founded fear for future persecution should the family be sent back to Indonesia. Your Honor, I would just briefly like to address a couple of points that were made by counsel for the petitioner. Do you know what's in the 2007 country report? No, Your Honor. I have not read that report. It's not in the record. The record closed some time ago, and the petitioners did not seek to have any subsequent country reports entered into the record based on a motion to reopen or anything of that nature. I would also like to point out that the humanitarian exception, so-called, that Mr. Ryan referred to a number of times, for the reasons that are discussed in some of the 28J letters, that simply is not at issue in this case because there's no factual predicate for an application of that exception, namely that the applicant had suffered extremely outrageous, severe, some form of very heightened past persecution in his home country. The facts in this case certainly have no relationship to those in this Court's Lau decision or in the BIA's decision in Matter of Chen, which detail facts that are very outrageous and show that there was rather terrible past persecution directed at the asylum seeker. That's certainly not the case here. If there are no further questions, I will yield the balance of my time. Thank you. Mr. Ryan? I'll just go to the humanitarian exception again. Matter of Chen, most of the injuries, horrible injuries in that case, were suffered by the applicant's father during the Cultural Revolution. So we have a family member who was severely injured in that case, and that's why we bring it into the context of this case, because we also have a family member who was weebly persecuted. We have cited the Mohammed case in our brief also as part of our core argument related to the humanitarian exception. And I might just say too that these arguments run together, that is the social group argument and also the humanitarian exception argument. They can be blended together as well. If there are no further questions, I'll just submit. Thank you very much. Thank you both for your argument. The case of Benyamin v. Mukasey is submitted.
judges: B. Fletcher, McKeown, N. R. Smith